[No. 30379.   Department Two.   May 10, 1948.]

JAMES BOYLE, *by Argie Boyle, his Guardian ad Litem, Respondent,* v. JOSEPH LEWIS *et al., Appellants.*[1]

[1]Reported in 193 P. (2d) 332.

N. A. *Pearson*, for appellants.

*Houghton, Cluck, Coughlin & Henry*, for respondent.

JEFFERS, J.—This is an action instituted by Argie Boyle, as guardian *ad litem* of James Boyle, against Joseph Lewis and wife, to recover damages for injuries received by James Boyle as the result of a collision between a car in which he was riding, the car being driven at the time of the accident by Jack Carlson, and a car being operated by defendant Joseph Lewis. It was alleged that the accident occurred in the intersection of Twenty-second avenue north and east Prospect street, in Seattle, Washington, on June 8, 1946, at about one-thirty a. m. It was further alleged in the complaint that, at the time of the accident, James Boyle was riding in the automobile as a guest of his friend, Jack Carlson. The basis of the complaint was the alleged negligence of defendant Joseph Lewis.

Lewis and wife, by their answer, denied the material allegations of the complaint and, as an affirmative defense, alleged that, at the time of the collision, plaintiff was on a joint venture with the driver of the car in which he was riding, and that the negligence of the driver became the negligence of plaintiff. The answer then set out the claimed acts of negligence on the part of Carlson, the driver of the car.

Plaintiff, by his reply, denied the affirmative allegations of the answer.

The cause came on for hearing on June 11, 1947, before the court and jury.

East Prospect street runs east and west, and Twenty-second avenue north runs north and south. The paved portion of each street is twenty-five feet wide. Prospect street, as it approaches the intersection from the east, has an upgrade of nine per cent, and Twenty-second avenue, as it approaches the intersection, has an upgrade of four per cent. On the northeast corner of the intersection there is a bulk-

head and hedge, which obstructs the view of a driver approaching the intersection from either the east or the north.

C. E. Beech, a traffic investigator for the Seattle police department, who arrived at the scene shortly after the accident, stated that one driving west on Prospect could not see north on Twenty-second avenue as he approached the intersection until he got up to within three or four feet of the sidewalk line.

At the time of the accident, Jack Carlson was driving his mother's car. Riding with him in the front seat was plaintiff, and in the back seat was Ed Bush and his girl friend, Gloria.

There is no question but that plaintiff was riding with Carlson as a guest. There is absolutely no evidence in this case which would establish the relationship of Carlson and plaintiff as that of joint adventurers, under the rules announced in *Carboneau v. Peterson*, 1 Wn. (2d) 347, 95 P. (2d) 1043.

The night was dark, and it was raining. Carlson stated that, as he approached the intersection, driving south on Twenty-second avenue, his headlights were on and his windshield wipers were working. There is a street light on a pole at the southwest corner of the intersection.

Carlson stated that it is necessary to get almost into the intersection before one can see down Prospect to the east; that as he approached the intersection he put his car in second gear and slowed down to about fifteen miles per hour; that he looked to the right and then to the left, but could not see anything to the left on account of the bulkhead; that he then proceeded into the intersection; that he again looked to the left

". . . and the next thing I seen was these parking lights, they was right on top of me, right on my left front fender. And from then on, I don't know what happened."

Carlson remembered what happened up to the time of the crash but did not remember what happened afterwards, as he was rendered unconscious.

"Q. You spoke of seeing parking lights. Would you tell us a little more about that? A. Well, I know that it wasn't— that it wasn't headlights on the car, because if there was headlights, they were very, very poor headlights and a headlight wouldn't be that small. It was, well, a person can imagine what a parking light would look like on a hazy evening. And that's just about all I seen. It was right on top of me. I don't believe that Mr. Lewis' car was any more than five or six feet from me when I seen him. And it hadn't been any more than a split second by the time that I had looked to my left, and we had gone on, maybe five or ten feet before the cars collided."

Carlson thought his car was about in the middle of the intersection when it was struck on the left side by the Lewis car.

On cross-examination, Carlson stated that he turned onto Twenty-second avenue about three blocks north of the intersection; that, as he proceeded south toward the intersection, he was driving about twenty miles per hour; that he was tending to his driving and not talking to the other passengers; that, as he approaches a blind intersection, he usually puts his car in second gear. Carlson had just had his brakes adjusted two days before the accident.

James Boyle stated that Carlson asked him to ride with him. The witness, after relating where they had been the first part of the evening, stated that they came into Twenty-second avenue about three blocks north of the intersection. As they approached the intersection from the north, Carlson was driving to the right of the center.

"Q. And when did you first see this car of Mr. Lewis? A. Well, we hit. I looked. And I was through the windshield. I was turned to my left in talking to some fellows in the back. Q. About how fast was Mr. Carlson driving as he came to and entered that intersection? A. About 18, 20 miles an hour. . . . Q. You say you were sitting in the front seat and turned to your left, speaking to the parties— A. (Interposing) Yes. Q. (Continuing) —speaking to the parties in the back seat? A. Yes. I was looking over the front seat into the back. Q. And did you see this Lewis car coming? A. No, not until it hit us. Q. Not until just as it hit you. After it hit you, I suppose you were in such a condition that you didn't have much of a chance to observe? A. No."

The witness stated that the lights on the Carlson car were burning as they entered the intersection.

On cross-examination, Boyle stated that he had no driver's license and did not drive.

"Q. Now, as you got to Prospect Street, how long had you been doing that, by the way? A. Pardon? Q. How long had you been doing that? A. Doing what? Q. Well, talking to them and looking to them in the back seat? A. Oh, I just turned around and said a couple of words, and that was all. Q. Did you—can you tell us how fast Carlson was driving as he approached the intersection there? A. Yeah, approximately. Q. How fast? A. Eighteen or twenty miles an hour. Q. How do you know that? A. Because I know. I can judge speed. I know he wasn't going very fast. He's a cautious driver. He was going slow. . . . Q. Now, did you feel him put the brakes on as he came up to the intersection? A. No, sir. I felt the car slow down. It was in compression, in second gear. Q. When did he put the car in second gear? A. I felt the car slow down about 25, 50 feet before the intersection, before the accident. I don't know whether it was in the intersection the accident happened or not, but I felt the car slow down, and then there was an accident. That's all there was to it."

The witness stated he did not see any cars parked along the street. Boyle stated that, when he felt the car slow down he turned around and looked to the front and went through the windshield. He stated that he was not surprised when the car slowed down, as Carlson had shifted into second gear at the intersection before the one here in question; that he saw the Lewis car just as it hit them, and then saw it again as he was sitting on the curb after the accident.

Mr. Lewis stated that, on the night of the accident, he turned left onto Prospect street from Twenty-third avenue; that, from Twenty-third to Twenty-second avenue on Prospect, there is an upgrade of about nine per cent; that he went into second gear as he approached the intersection of Twenty-second and Prospect. He stated that the northeast corner of the intersection is obstructed; that there is quite a high hedge and trees along the north side of Pros-

pect, and trees on the east side of Twenty-second avenue; that he was traveling at about fifteen to twenty miles per hour as he approached the intersection.

"Q. And when you got up to the intersection, what did you do there? A. I looked to the right, and I didn't see any headlights. Q. Did you look to your right as soon as you got out far enough? A. That's right. Q. To look up there. What were the conditions of 22nd Avenue to the north there as to whether or not there were cars parked on either side? A. There were cars parked on both sides of the street. . . . Q. What speed did you cross the intersection at? A. Oh, about 15 to 20 miles. Q. And when did you see the other car? A. When I got about the middle of the street I noticed this car, and I speeded up my motor, but he ran right into me. Q. How far was he away from you when you saw him? A. About 50 feet, 45 to 50 feet. Q. And you had looked up there before that and did not see him? A. That's right. Q. Approximately what speed would you say his car was traveling? A. Oh, between 35 and 50 miles. Q. What part of his car and yours came together? A. His front —he hit me right in the rear right they came together, and they side-swiped, and he turned me around on 22nd Avenue. . . . Q. Did you notice his car slow up at all? A. No, I didn't. . . . Q. What was the condition of the boys when you saw them? A. The driver of the car was knocked out completely, and the other fellow, Jim Boyle, went through the windshield, and his face was all cut up."

On cross-examination, Lewis admitted that in 1946 he had been convicted of negligent driving in two separate cases; that at first all he could see of the Carlson car was the lights; that he just got a glimpse of it, and the cars came together. Lewis admitted that, when he got out even with the east curb of Twenty-second avenue, he could look up that street.

"Q. Then, can you tell us why it was when you got out here even with the curb, was there any reason then you couldn't look up and see? A. I didn't see any car. I didn't see any car. Q. Was there any reason you couldn't look up 22nd at that point? A. No. Q. You could see up there for a block or any other distance? A. That is right. That is right. Q. At that point [when he was at the curb line], couldn't you? A. That is right. Q. You looked and just

didn't see anything? A. That is right. He might have turned the corner. I don't know."

We here call attention to the fact that, while Lewis stated that, when he got out to the curb line, he looked north on Twenty-second avenue and did not see anything, the two cars collided about the middle of the intersection north and south, and a little to the west of the center east and west.

Lewis further stated that he saw the Carlson car only for a split second before the collision, and that his estimate of the speed of the Carlson car was based upon his getting a glimpse of the headlights.

"Q. When you saw this car, what, if anything, did you attempt to do in order to avoid the accident? A. I tried to cross him. Q. Tried to go on across? A. That's right. Q. Did you change your course or continue straight across? A. I continued straight across."

Mr. Beech, hereinbefore referred to, stated that he found the Carlson car at the southwest corner of the intersection alongside a telephone pole, and the Lewis car was approximately fifty feet south of there; that when he arrived there were no cars parked on the east side of Twenty-second avenue north of the intersection. The witness identified plaintiff's exhibit No. 2, which is a picture of the Lewis car after the accident. Mr. Beech stated that the right side of the Lewis car, the right front, was badly damaged; that the right side showed sideswiping, and the right rear showed damage; in other words, from front to back the right side showed damage. He further stated, referring to the Lewis car:

"It shows scraping, side-swipe scraping marks on the right side, and the front end, on the front end of the car, the right front wheel is bent. The bumper, the front—right front of the bumper is pushed back against the wheel, and the fender is all caved in. . . . Q. And on the—what was the condition of the Carlson car? A. The condition of the Carlson car, the right front—the left front of Carlson's car was badly damaged. The left side was damaged from side-swipe, and the left rear was also damaged."

Mr. Beech stated that he talked with Mr. Lewis at the scene of the accident and asked him how it happened; that

Lewis told Mr. Beech and Officer McKay that he, Lewis, was driving west on Prospect street at approximately twenty-five miles per hour, and that he did not see the Carlson car until the point of impact—until they struck. Beech designated the point of the collision as just to the west of the center of Twenty-second avenue, projected through the intersection. Mr. Beech again stated that Mr. Lewis told him he was driving twenty-five miles an hour at the point of impact. Mr. Beech examined the Carlson car and found it in second gear. He stated that he examined the Carlson car to see in what gear it was because one of the boys, whose name he thought was Bush, stated that they (referring to the Carlson car) were in second gear. This conversation took place in the presence of Mr. Lewis.

Mr. McKay, the other traffic officer who was with Mr. Beech, stated that Mr. Lewis said he did not know how the accident happened; that he did not see the other car until the impact. Mr. McKay said that Lewis stated three times that he was going twenty-five miles an hour.

Neither Bush nor the young lady who was with him testified in the case. It may be stated here that Mr. Lewis was the only witness who testified in behalf of defendants.

The jury returned the following verdict in favor of plaintiff:

"For pain, suffering, permanent injuries and
  general damages in the sum of............$4,000.00
"For hospital and medical and dental expenses,
  the sum of.............................  502.35"

Defendants filed a motion for new trial, which was denied, and on June 30, 1947, judgment was entered in accordance with the verdict of the jury. Defendants have appealed from the judgment entered.

The assignments of error are: (1) in withdrawing from the jury the question of respondent's contributory negligence, and in giving instruction No. 6; (2) in giving instruction No. 11; (3) in giving certain parts of instruction No. 12; (4) in failing to give requested instructions Nos. 3 and 4; (5) in failing to give requested instruction No. 6; (6) in

failing to give requested instruction No. 8; and (7) in giving instruction No. 14. The instructions given and those requested are set out in appellants' brief.

■ We are of the opinion there was ample evidence to support the verdict of the jury on the theory that appellant Joseph Lewis (who will be referred to as the sole appellant) was negligent, and that such negligence was the proximate cause of the collision and the resulting injuries to respondent. Appellant was the disfavored driver on the left. He produced no evidence which, in our opinion, tended to show that Carlson so wrongfully, negligently, or unlawfully operated his car as to deceive a reasonably prudent driver on the left and warrant him in going forward upon the assumption that he had the right to proceed. *Martin v. Hadenfeldt,* 157 Wash. 563, 567, 289 Pac. 533.

■ It is apparent from appellant's testimony that he was not and could not have been deceived by the manner in which the Carlson car was being operated, as appellant admitted he did not see the Carlson car until a split second before the accident, and he certainly could not have been deceived by what he did not see. *Calvert v. Seattle,* 23 Wn. (2d) 817, 821, 162 P. (2d) 441.

Appellant first contends that the trial court erred in withdrawing from the jury the question of respondent's contributory negligence, and in giving instruction No. 6, which states:

"I instruct you that there is no evidence of any contributory negligence on plaintiff's part and that defense is withdrawn from your consideration.

"You will therefore decide the question whether or no the defendant Joseph Lewis was negligent and, if so, whether said negligence proximately caused the injury to the plaintiff James Boyle. And if you find from a preponderance of the evidence that the defendant Joseph Lewis was negligent, and that such negligence was the proximate cause of the injury to plaintiff, then your verdict must be for the plaintiff James Boyle."

Instruction No. 5 given by the court states:

"You are instructed that the plaintiff James Boyle was a guest in the car in which he was riding, and operated by Jack Carlson, and that the negligence, if any, of the said Jack Carlson, the driver of said car, is not imputed to the plaintiff herein."

██  No error is based upon the giving of instruction No. 5, and it became the law of the case.

██  There is no question but that the affirmative defense contained in appellant's answer is based upon the theory that respondent and Carlson, the driver of the car, were engaged in a joint venture; that Carlson was negligent, and that his negligence is imputed to respondent. However, the trial court instructed the jury that respondent was a guest, and that the negligence, if any, of Carlson could not be imputed to respondent. The instruction correctly stated the law relative to the negligence of Carlson, if any, being imputed to respondent.

We stated in *Weaver v. McClintock-Trunkey Co.*, 8 Wn. (2d) 154, 161, 111 P. (2d) 570, 114 P. (2d) 1004:

"Even if, as counsel for appellant insists, the operator of the automobile in which respondent wife was riding [she was riding as a guest in a car being operated by one Roy Smith] were guilty of contributory negligence in stopping too suddenly in order to avoid the threatened collision, his negligence could not be imputed to his passenger or guest.

"'A passenger or guest in a vehicle is not barred from recovery for harm resulting from the negligence of a third person by the contributory negligence of his carrier or host.' Restatement of the Law of Torts, 1272, § 490."

In *Justice v. Lavagetto*, 9 Wn. (2d) 77, 82, 113 P. (2d) 1025, we quoted from the case of *McCormick v. Hannenberg*, 170 Wash. 133, 15 P. (2d) 939, as follows:

"'If appellants' host were negligent, respondent would not be thereby relieved of liability if respondent were also negligent and his negligence were a proximate cause of the accident.'"

Appellant contends, however, that there were sufficient allegations of respondent's contributory negligence in the

affirmative defense of his answer. The affirmative defense consists of two paragraphs, the first of which alleged that respondent and Carlson were engaged in a joint venture; that the negligence of Carlson was the proximate cause of the collision; and that "the negligence of the driver which is imputed to the plaintiff [respondent] is set forth in the following paragraph." Paragraph No. 2 then states:

"That the negligence of the driver which is imputed to plaintiff is as follows: [Then follow the claimed acts of negligence of Carlson.] That plaintiff knowing the careless and negligent manner in which said automobile was being driven failed to caution and or remonstrate with his driver, but acquiesced in same."

■ We shall assume, for the purpose of argument only, that the above allegations were sufficient allegations of contributory negligence on the part of respondent. There is no question but that we have held that even a guest may be guilty of such negligence as would cause or contribute to a collision, and which would render him guilty of contributory negligence and preclude his recovery. *Bauer v. Tougaw*, 128 Wash. 654, 224 Pac. 20; *Meath v. Northern Pac. R. Co.*, 179 Wash. 177, 36 P. (2d) 533. The rule announced in *Bauer v. Tougaw, supra*, is stated as follows:

"The rule applicable to this situation is that if the plaintiff, in the exercise of due and ordinary care, such as would be exercised by a reasonably prudent and cautious man, saw, or should have seen, that the driver of the car was conducting himself in a negligent manner, and if, under those circumstances, in the exercise of due and ordinary care, a reasonably prudent and cautious man would have warned or cautioned or attempted to persuade the driver from his reckless conduct and drive his car in a careful and prudent manner, and failed to give such warning or caution or to make such attempt, and such failure caused or contributed to the collision, then the passenger would be guilty of contributory negligence which would bar his recovery."

■ Contributory negligence must be set up as an affirmative defense, and the burden of proving it by a preponderance of the evidence is on the defendant. *Hart v. Clapp*, 185 Wash. 362, 363, 54 P. (2d) 1012. There must be sub-

stantial evidence of negligence—a scintilla of evidence will not do. *Dunsmoor v. North Coast Transp. Co.*, 154 Wash. 229, 281 Pac. 995.

■ Appellant states in his brief:

"Can it be said that, as a matter of law that this plaintiff [respondent] riding in the front seat of the automobile, with the car traveling 35 to 50 miles per hour, *as Lewis testified it was,* on a dark and rainy night through narrow residential streets, all obstructed as to view, as set out by the statute, paying absolutely no attention to the driving and operation of the car and making no protest or caution, was not guilty of contributory negligence?" (Italics ours.)

If the above were a correct statement of the facts, it might at least be said that the question of respondent's contributory negligence was for the jury, but it is our opinion that the above statement goes far beyond what the facts show. In our opinion, there is absolutely no testimony in this case that Carlson had been operating his car other than in a careful and prudent manner, up to the time he arrived at a point forty-five to fifty feet north of where the collision occurred. The only testimony that the Carlson car was traveling at an excessive rate of speed for this forty-five to fifty feet was that of appellant, who admitted that he did not see the Carlson car until just before the collision, and then only for a split second, and that his estimate of the speed of the car was based upon his getting a glimpse of the headlights. We are of the opinion that appellant's estimate of the speed of the Carlson car was a mere guess, and was not of the substantial character on which a jury is permitted to found a verdict. See *Dunsmoor v. North Coast Transp. Co., supra,* and *Poland v. Seattle,* 200 Wash. 208, 93 P. (2d) 379.

We are satisfied there was no substantial evidence in this case upon which a verdict that respondent was guilty of contributory negligence could be based, and that the court properly withdrew this issue from the jury's consideration.

■ Assignment of error No. 4 is based upon the refusal of the court to give requested instructions Nos. 3 and 4. Both these requested instructions informed the

jury of certain conditions which, if found to exist, would prevent respondent from recovery and would make him guilty of contributory negligence. The only exceptions taken by appellant to the court's refusal to give these instructions were that the failure to give them was prejudicial to appellant.

We have grave doubts as to whether such exceptions were sufficient, under Rule of Practice 10, 18 Wn. (2d) 39-a, to entitle appellant to a consideration of the assignment. However, assuming that the exceptions were sufficient, we are of the opinion the court did not err in refusing to give the requested instructions, first, because, respondent being a guest in the Carlson car, the negligence of Carlson, if any, could not be imputed to respondent; and second, because there not only was no substantial evidence upon which the jury, under the rule announced in *Bauer v. Tougaw, supra,* could have found that respondent himself was guilty of contributory negligence, but, in our opinion, there was no evidence upon which such a finding could have been made, and therefore, even though the trial court may have removed from the jury the question of respondent's contributory negligence on the theory of imputed negligence, appellant was not prejudiced by such action.

We are further of the opinion neither of these instructions properly stated the law relative to when and under what circumstances respondent could be held to be guilty of contributory negligence.

Assignment of error No. 5 is based upon the refusal of the court to give requested instruction No. 6, and assignment of error No. 6 is based upon the refusal of the court to give requested instruction No. 8. No argument in support of these two assignments of error is made, other than to state that they "should have been given under the circumstances as the entire instructions of the court were very one-sided and in favor of the plaintiff."

We have stated that an assignment of error will not be considered when no argument is made thereon. *Burge v. Anderson,* 164 Wash. 509, 3 P. (2d) 131. However, it is our opinion that requested instruction No. 6 was not on any

theory applicable to the facts in this case, and requested instruction No. 8 was sufficiently covered by instruction No. 8 as given by the court.

We shall next discuss assignment of error No. 2, based upon the giving of instruction No. 11, which states:

"It is the law in this state that when a person testifies that he looked and did not see an object which plainly he could have seen, he will not be heard to say that he looked and did not see. In other words, the situation is the same as though he had looked and seen the object."

It seems to be the contention of appellant that the effect of this instruction was to inform the jury that appellant must have seen the Carlson car coming. We do not think the effect of the instruction was as contended by appellant. It was a general instruction, stating a principle of law applicable where one testifies that he looked and did not see what plainly he could have seen had he looked. The court did not apply the instruction to either party. From the evidence in this case, the jury certainly could have found that the Carlson car was in plain sight, with its lights burning, when appellant reached a point where he admitted he could see north on Twenty-second avenue, and that he could have seen the Carlson car had he looked. No contention is made that the instruction was not a proper statement of the law, but appellant argues that it was not applicable here. We are of the opinion the instruction was applicable, and that the court did not err in giving it.

Assignment of error No. 3 is based upon the giving of part of instruction No. 12 relative to the measure of damages. Appellant took the following exception to instruction No. 12:

"Excepts to the giving of portions of instruction No. 12 about damages:

" ' . . . You will also allow him such sum for hospital, medical, dental and nursing expenses as you find plaintiff has necessarily and reasonably incurred or is reasonably certain to be compelled reasonably and necessarily to incur in the future as a proximate result of this accident.'

"Now, the doctor didn't say there's any probable thing. He said the probability was just to say as much it would not be. Therefore, it was just speculation in the giving of that; taking into consideration future expenses that he would be compelled to incur would be erroneous."

Appellant in his brief objects to the following italicized portion of instruction No. 12:

"In arriving at such amount you should take into consideration the pain and suffering, if any is shown by the evidence, which the plaintiff has sustained, *or which he is reasonably certain to undergo in the future as the result of injuries sustained in such accident.* You will also allow him such sum for hospital, medical, dental and nursing expenses as you find plaintiff has necessarily and reasonably incurred *or is reasonably certain to be compelled reasonably and necessarily to incur in the future as a proximate result of this accident.* . . .

"The law has not furnished us with any fixed standard by which to measure pain, suffering or personal disfigurement. With reference to these matters you must be governed by your own good judgment, by the evidence in the case and by the law as I have given it to you. In determining compensation, if any, for these things, you are not permitted to indulge in uncertainties and speculations, nor allow damages that are remote, uncertain or speculative, but may award damages only for such matters as have been shown to have happened *or to be reasonably certain to happen in the future.*"

■ We are of the opinion that appellant's objection must be limited to the part of the instruction excepted to, and when so limited, it is apparent that appellant's objection goes only to that part of instruction No. 12 which relates to hospital, medical, dental, and nursing expenses, and which instructed the jury that they could consider any future expenses which were reasonably certain to be incurred as a proximate result of the accident.

In the case of *Richardson v. Pacific Power & Light Co.,* 11 Wn. (2d) 288, 311, 118 P. (2d) 985, we considered an exception taken to only part of an instruction, and in regard thereto stated:

"Upon this appeal, however, appellants have departed from the basis of their exception and now argue that there

was no room at all for the presumption in this case, because of the clearness of the evidence that Richardson was violating the rules of his employer, and because of the evidence of the physical facts at, and immediately after, the time of his death. It will be noted, however, that the exception below was limited in scope. It therefore limits the range of argument now open to appellants. By excepting in this particular manner, appellants tacitly admitted the propriety of giving *some* instruction as to the presumption of due care; hence they cannot be heard to controvert that proposition now. It is also to be noted that appellants did not except to the first paragraph of the instruction; hence the correctness and propriety of that exposition of the law is not now open to attack."

The undisputed testimony shows that respondent had necessarily incurred the following hospital, dental, and medical expenses: Drs. Palmer and Hall, $310; Seattle General hospital, $83.35; Dr. Hartzell for X rays, $40; Dr. Dougherty, dentist, $69; making a total of $502.35.

The jury awarded respondent, for hospital, medical, and dental expenses, the sum of $502.35, which was the exact amount he had incurred. It seems to us apparent that the jury made no award for any hospital, medical, dental, or nursing expenses to be incurred in the future, and therefore that part of instruction No. 12, "or is reasonably certain to be compelled reasonably and necessarily to incur in the future as a proximate result of this accident," was not prejudicial, even if it be conceded that the testimony did not warrant the giving of an instruction relative to future expense. See *Auerbach v. Webb,* 170 Wash. 567, 17 P. (2d) 1. In addition, there was some evidence given by respondent's mother and by Dr. Hall that it would be necessary to incur future medical expense.

The cases of *Stoddard v. Smathers,* 120 Wash. 53, 206 Pac. 933; *Ely v. North Coast Lines,* 151 Wash. 137, 275 Pac. 78; *Burge v. Anderson, supra*; and *Storm v. Goldberg,* 165 Wash. 36, 4 P. (2d) 1104, cited by appellant, are, in our opinion, distinguishable on the facts.

Appellant's last assignment of error, No. 7, is based upon the giving of instruction No. 14, which states:

"It will be improper for you to arrive at the amount to be awarded the plaintiff, if you find that he should be awarded damages, by the so-called 'quotient method,' that is, by first agreeing to be bound by, and then arriving at such amount by having each individual juror set down the amount he or she considers the proper award, and then adding such sums together and dividing that amount by twelve, and making the result the amount to be awarded by the jury as damages. This method is illegal and not to be followed."

As to this instruction appellant states:

"We believe that this was in error because the court gives the inference that the jury are going to find for the plaintiff and is concerned that they might arrive at it by the incorrect method."

We do not think the instruction is open to the criticism made by appellant, as it plainly states that it is applicable only if they find that plaintiff should be awarded damages. We are confirmed in our conclusion by a consideration of the other instructions given. In instructions Nos. 3 and 4, the jury were told that in order to recover, plaintiff must prove by a preponderance of the evidence that defendants were negligent; that in determining compensation, if any, for plaintiff, they must not indulge in uncertainties and speculation, nor allow damages which are remote, uncertain, or speculative; and that the fact that the court had instructed them upon the rules governing the measure of damages was not to be taken by them as an indication on the part of the court that it believed or did not believe that the plaintiff was entitled to recover damages.

We stated in *Sweazey v. Valley Transport*, 6 Wn. (2d) 324, 354, 107 P. (2d) 567, 111 P. (2d) 1010, 140 A. L. R. 1:

"In a case of this character, where general damages are alleged, and in all probability it will be difficult for all the jurors to arrive at an exact amount in the event damages are allowed, it would not be out of place to give a cautionary instruction on a quotient verdict, and thus avoid any possibility of such a verdict being reached."

We are of the opinion the court did not err in giving instruction No. 14.

Finding no reversible error in this case, the judgment of the trial court entered on the verdict of the jury is affirmed.

MALLERY, C. J., BEALS, STEINERT, and SIMPSON, JJ., concur.

[1]Reported in 193 P. (2d) 353.