[No. 30959. Department One. July 1, 1949.]

ROBERT B. BROWN, *Respondent,* v. INTERCOASTAL
FISHERIES, INC. *Appellant.*[1]

[1]Reported in 207 P. (2d) 1205.

*McClure & McClure* and *Edgar C. Snyder*, for appellant.

*Bassett & Geisness*, for respondent.

MALLERY, J.—This is an action brought under 46 U.S.C. § 688, the Jones act, to recover damages for injuries suffered by respondent seaman in the course of his employment on appellant's fishing boat. His employer appeals from the $25,000 judgment.

On October 4, 1945, respondent shipped out of Seattle as a seaman on appellant's fishing vessel, "JOHN W.". The master knew of respondent's inexperience.

En route to San Francisco, where the "JOHN W." was to be based during the winter fishing season, heavy weather was encountered, which opened a leak in the propeller shaft stuffing box. It became necessary to pump the bilges every few hours while underway and once daily while moored.

On reaching Fisherman's Wharf, San Francisco, an effort was made to "take-up" on the stuffing box, but this was ineffectual, and it continued to be necessary to pump frequently.

On December 10th, the vessel was secured at Fisherman's Wharf for the Christmas holidays, and the crew, with the exception of respondent, left to spend Christmas in Seattle. The master, knowing that respondent intended to spend the holidays near San Francisco, asked him to call at the wharf periodically to see that the vessel was in good shape.

The details of his instructions are the crucial facts on this appeal. The jury could have found that the master ordered

respondent (1) to inspect the vessel and her lines periodically, (2) to keep her pumped out, (3) not to start the engine himself under any circumstances but (4) if there was anything respondent couldn't handle, to get help from the "AMERICAN STAR," a vessel moored just ahead.

On December 12th, respondent inspected the "JOHN W." and found her listing because of the water in her bilges, although she had been pumped dry December 10th. He tried to operate the hand bilge pump and failed. Whereupon, attempting to make it work, he took it apart and could not reassemble it. Finally, after finding no experienced hands aboard the "AMERICAN STAR" and satisfied that nothing more could be done that day, he departed.

When he returned the following morning, the "JOHN W." was still listing and a coast guard crew was aboard pumping her out with a portable gasoline pump. The coast guard petty officer in charge ordered respondent to inspect the interior of the hull to locate the leak. Accordingly, respondent, unmindful that the leak was in the stuffing box and not in the hull, donned hip-length fishing boots, which he neglected to secure by straps to his belt, went below, and inspected the interior of the hull. He found no leaks. Returning topside, he informed the petty officer of his inspection and of the condition of the hand bilge pump. The petty officer suggested that respondent use the power-driven bilge pump. Respondent refused, explaining that he had been ordered not to start the engine. The petty officer then suggested that respondent find someone who could operate it so as to relieve the coast guard from giving the vessel constant attention.

While the coast guard crew was still aboard respondent obtained assistance from Mr. Knutson, assistant engineer of the "AMERICAN STAR." Knutson, having decided not to repair the hand bilge pump, went below and started the engine. Once the engine was operating, Knutson had to familiarize himself with the vessel's pumping system in order to open the proper combination of bilge pump valves to cause the bilge pump to take suction. He went topside to see if water was being discharged through the overboard

discharge outlet. He left respondent standing on a narrow catwalk on the port side of the engine room near an exposed auxiliary shaft, holding an extension light which it had been necessary to use when the fixed overhead lights on the port side of the engine room would not operate.

This unhoused auxiliary shaft, one and a half inches in diameter, which drives the bilge pump, is on the port side of the engine, running fore and aft parallel to the main shaft. It is located six inches outboard of the engine casing and nine inches above the catwalk upon which respondent was standing. Midway in the length of the shaft is an exposed coupling three to six inches in diameter with customary coupling bolts. This exposure is the chief specification of unseaworthiness constituting the negligence relied upon by respondent.

In the course of the morning's activities, the tops of respondent's hip-length boots slipped down so that the top of each boot, with bootstrap dangling, was hanging loose around respondent's calves. While Knutson was topside, respondent's left bootstrap, boot, and pants caught in the whirling auxiliary shaft coupling, pulling his left foot into the machinery in such manner that his left foot was crushed and torn off above the ankle.

Respondent has undergone two major operations and will require more surgery. He has required several adjustments and substitutions of artificial legs. He is now in normal health and is gainfully employed but will be unable to do work which will require him to stand or walk much. His income, since the injury, has been reduced, and the jury reasonably could have found that his future earning power has been diminished. At the time of the accident, he was twenty-eight years old with a life expectancy of thirty-six years.

Under eight assignments, the appellant contends generally that the court erred: (1) in not dismissing the action, (2) in not instructing the jury to return a verdict for the defendant, (3) in denying defendant's motion for judgment n.o.v., (4) in denying defendant's motion for a new trial, (5) in entering judgment on the verdict; and more specifi-

cally that the court erred (6) in refusing to give an instruction and (7 and 8) to submit two special interrogatories.

■ As to the court's refusal to submit the special interrogatories, it is well settled that the submitting of special interrogatories is discretionary with the trial court and that refusal to submit requested interrogatories will not be reviewed on appeal. *Salo v. Nelson*, 22 Wn. (2d) 525, 529, 156 P. (2d) 664, 53 Am. Jur. 149.

The court refused to give the following requested instruction:

" 'Seaworthiness' is a relative term depending on the vessel and voyage. Seaworthiness in port or for temporary purposes, such as mere change of position in harbor, or proceeding out of port, or lying in offing, may be one thing, and seaworthiness for a whole voyage quite another. The term 'seaworthiness' implies that the vessel is properly officered, manned and equipped."

■ Error will not be predicated upon the court's refusal to give a requested instruction if its subject is sufficiently covered by another instruction. *Cook v. Danaher Lbr. Co.*, 61 Wash. 118, 123, 112 Pac. 245; *Boyle v. Lewis*, 30 Wn. (2d) 665, 679, 193 P. (2d) 332.

Instruction No. 6, discussing negligence, charged the jury as follows:

"It [negligence] may consist in either doing some act which reasonably prudent person would not do *under the same or similar circumstances* or in failing to do something which a reasonably prudent person would have done *under the same or similar circumstances*." (Italics ours.)

■ A standard of care remains constant under all circumstances. It is the quantum of care necessary to achieve the standard which varies.

■ The doctrine of seaworthiness is a contract concept which we borrow from the admiralty in these tort actions arising under the Jones act as a convenient device for establishing the standard of care the want of which may constitute negligent conduct. The standard of care which this doctrine imposes is the duty to provide a seaworthy vessel

which the owner impliedly promised to his seamen in their contract of employment.

■ The refused instruction stated, in effect, that the quantum of care necessary to achieve seaworthiness varies according to the location and status of the vessel.

The instruction given sufficiently informed the jury that the standard of care of the prudent man is constant but that the quantum of care necessary to achieve the standard varies according to the circumstances. This is a correct statement of the law, and the refused instruction would have accomplished no more than this.

■ Undoubtedly, the appellant created a risk of injury by failing to house the coupling which tore off respondent's foot. The question for the jury was whether this risk was one that a prudent man would have created under the circumstances. The reasonableness or unreasonableness of any particular risk must be viewed in the light of the utility of creating it as compared to the expense, difficulty, and ability of guarding against it.

In the instant case, the jury was to view the utility and economy of leaving the coupling exposed as compared to the magnitude of the risk of losing life or limb by coming in contact with it.

We do not think that the magnitude of the risk was dependent upon whether the vessel was moored or at sea. The vessel leaked. The time duration of the pumping operations, when the risk would be present, might vary according to the vessel's status, but we think the other factors of the risk would be of the same magnitude. In any event, we do not follow appellant's argument that the location or status of the vessel required emphasis as set out in appellant's instructions.

■ Appellant's requested instructions to return a verdict for the defendant are not set out in the brief. Therefore, they will not be reviewed. See Rule of Practice 10, 18 Wn. (2d) 39a; Rem. Rev. Stat. (Sup.), § 308-10 [P.P.C. § 93-19]; *Peterson v. Department of Labor & Industries*, 22 Wn. (2d) 647, 653, 157 P. (2d) 298; *State v. Payne*, 25 Wn. (2d)

407, 171 P. (2d) 227, 175 P. (2d) 494. Rule of Court 16 (5), 18 Wn. (2d) 18a, Rem. Supp. 1945, p. 14, P.P.C. § 6-31 (5); *State v. Severns*, 13 Wn. (2d) 542, 125 P. (2d) 659; *Gray v. Davidson*, 15 Wn. (2d) 257, 278, 130 P. (2d) 341, 136 P. (2d) 187.

The formal assignments of error are supported by three "propositions of law" which we quote from appellant's brief:

"(1) At the time of his injury Brown was a seaman engaged in an intentional, willful and entirely unnecessary disobedience of the lawful orders of the master. Consequently he cannot recover.

"(2) The testimony is insufficient to support the verdict of the jury, or a verdict in any sum in favor of respondent.

"(3) Conceding for the sake of the argument, but not admitting, that respondent is entitled to recovery, the verdict is greatly excessive in amount and should be reduced."

■ The evidence is in conflict, and, while it is true that appellant's evidence supports its theory of willful disobedience, the jury was entitled to disbelieve some or all of it. We are required to assume that the jury found the facts to be at least as favorable for respondent as we have stated them in this opinion rather than as contended for by appellant. *Graham v. Roderick*, 32 Wn. (2d) 427, 202 P. (2d) 253.

So viewed, the evidence does not require us to find the willful disobedience, as a matter of law, which is necessary to support a judgment n.o.v. Nor is the evidence insufficient to support the verdict.

■ We are not prepared to hold that the verdict is so *unmistakably* excessive either under the comparative negligence doctrine required by the Jones act or under the purview of Rem. Rev. Stat. (Sup.), § 399 [P.P.C. § 78-3], as to require a new trial.

The judgment is affirmed.

JEFFERS, C. J., BEALS, STEINERT, and HILL, JJ., concur.