[No. 31934. Department One. August 7, 1952.]

BERNARD C. SEVENER, *Respondent*, v. NORTHWEST TRACTOR AND EQUIPMENT CORPORATION, *Appellant*.[1]

[1]Reported in 247 P. (2d) 237.

*Ferguson, Burdell & Armstrong,* for appellant.

*Bassett, Geisness & Vance,* for respondent.

DONWORTH, J.—Plaintiff was, at the time this controversy arose, a salesman employed by defendant, a Washington corporation engaged in the buying and selling of machinery. He sought in this action to recover a commission of $24,562.44, which he allegedly earned in finding a buyer for eighty-six tractors pursuant to his contract of employment, or, in the alternative, that he be awarded the reasonable value of his services in finding a buyer at the special instance and request of defendant.

In his amended complaint, plaintiff alleged, as a first cause of action, his employment, that his compensation was five per cent of the gross sale price of machinery sold to buyers found by him, and that Frank Murphy, an officer of defendant corporation, requested him, early in May, 1947, to find buyers for machinery and equipment which had been acquired by a Philippine corporation having the same name as defendant. He further alleged that Murphy then informed him that he would be protected in connection with such sales, which was intended to mean, and which plaintiff took to mean, that he would receive his regular commission of five per cent of the gross sales price, but that thereafter, about July 1, 1947, Murphy told him his compensation for sales of the Philippine corporation machinery would be at the rate of five per cent of sixty-five per cent of the factory list price of the machinery, and that sales would have to be made at a price equal to or in excess of sixty-five per cent

of the factory list price in order for him to receive a commission.

Plaintiff then alleged in some detail the means by which he secured a buyer who, on or about June 25, 1947, purchased from the Philippine corporation eighty-six tractors for a total price of $491,248.82, which was equal to sixty-five per cent of the factory list price of the tractors, and that he had demanded and defendant had refused to pay him his commission thereon. He further alleged that defendant and the Philippine corporation of the same name were joint venturers, and that the sale of the eighty-six tractors was consummated in the course of the joint venture.

In his second cause of action, plaintiff pleaded that, at the special instance and request of defendant, he found a buyer for the tractors and that the reasonable value of his services was $24,562.44.

In its answer, defendant denied all the material allegations of the amended complaint and pleaded as affirmative defenses that the tractors were owned by Northwest Tractor & Equipment (Phil.) Corp. or another Philippine corporation, Northwest Commercial Corp.; that defendant was not entitled to and did not benefit from the sale; that Murphy was not authorized by defendant to make any agreement to pay commission upon sales of machinery belonging to the Philippine corporations and that any such agreement made by Murphy was not binding upon defendant; that plaintiff was not authorized to employ subagents in selling or to determine the terms upon which sales would be made by the Philippine corporations.

It does not appear from the record that plaintiff made any reply to these affirmative defenses.

The action was tried before the court sitting with a jury. Defendant's challenge to the sufficiency of the evidence and motion for dismissal at the close of plaintiff's case was denied, as was its motion for a directed verdict at the conclusion of the trial.

The jury returned a verdict for plaintiff for the full amount prayed for. Defendant's motion for judgment notwithstanding the verdict or in the alternative for a new

trial was denied by the court, and from a judgment subsequently entered upon the jury's verdict defendant has appealed.

The factual background of this controversy is an extremely complicated one. To attempt to describe the details of the business relationship of the parties and their connection with the sale of these tractors would unduly extend this opinion and would serve no useful purpose. The testimony introduced was in direct conflict upon the material issues presented. The jury had the right and duty to determine the factual issues under proper instructions. We, therefore, confine our discussion of the facts to those necessary to an understanding of appellant's assignments of error.

At the conclusion of World War II, the United States had a large quantity of military equipment located in the Philippines. Approximately $630,000,000 worth of this equipment was declared to be surplus and given to the Philippine government, which in turn sold some of it to private buyers.

Bernard Campbell and Frank Murphy were, prior to July, 1946, equal partners engaged in the business of buying and selling machinery in Seattle. At that time, they incorporated their business as Northwest Tractor and Equipment Corp., appellant in this action. Except for one qualifying share, Campbell and Murphy owned all the stock of appellant, which was divided equally between them. Campbell was president and Murphy, vice-president of appellant corporation.

In August, 1946, respondent was employed by appellant as its sales manager and only salesman. The oral agreement whereby he was employed provided that he should be paid a commission of five per cent of the gross sales price of all machinery he sold. Murphy and Campbell maintained at the trial of this action that respondent did not become entitled to and did not receive commissions for merely finding buyers; that he was paid commissions only for sales that he consummated. Respondent testified that he was paid commissions whether he merely found buyers or whether he performed other duties in order to consummate sales. Re-

spondent was paid a minimum salary of two hundred dollars per month, which was charged against commissions earned. At all times material to this controversy, machinery and tractors were in short supply and buyers were frantically trying to buy.

In February, 1947, Campbell went to the Philippines to investigate the possibilities of buying surplus army equipment which had been turned over to the Philippine government. Shortly after he arrived in Manila, he learned that a certain lot of equipment (designated as depot 16), consisting of approximately two hundred tractors besides cranes and other heavy machinery, would soon be offered for sale by the Philippine government. Both Murphy and Campbell inspected depot 16 and decided to acquire it, if possible. They considered having the purchase made through appellant corporation, but upon advice of their attorneys and accountants and in compliance with the wishes of others whom they had secured to associate with them in the venture, they decided to form a Philippine corporation for the purpose of buying depot 16. One of the principal reasons for organizing a new corporation was to reduce their tax liability.

On or about May 20, 1947, Northwest Tractor & Equipment (Phil.) Corp. (herein referred to as the Philippine corporation) was incorporated under the laws of the Philippine Islands for the purpose of buying depot 16. Shortly thereafter, another Philippine corporation, Northwest Commercial Corp., was formed for the purpose of engaging in general trade and acting as selling agent for the first mentioned corporation.

In order to finance the operations of these Philippine corporations, Murphy, at Campbell's request, borrowed $200,000 in Seattle from sources identified as "the Navarre interests." The $200,000 was actually loaned by the Navarre interests to appellant corporation, which in turn loaned the money to Campbell individually. Campbell also secured $100,000 from Northwest Tractor Co., Ltd., a British Columbia corporation, in which Campbell and Murphy owned

forty-nine per cent of the stock, divided equally between them.

With the funds thus secured, Campbell acquired 80% or 85% of the stock in the Philippine corporation and about 65% of the stock in Northwest Commercial Corp. The remaining shares were divided among three or four minority stockholders who were residents or citizens of the Philippine Islands and who were evidently brought into the corporations either because of their influence with the Philippine government or their knowledge of Philippine business activities.

The Philippine corporation on May 31, 1947, entered into a contract of joint venture whereby one J. Amado Araneta & Co., Inc., acquired a twenty per cent interest in the purchase of depot 16 (which had in fact, however, already been acquired by the Philippine corporation).

Campbell was president of both the Philippine corporation and Northwest Commercial Corp. The Philippine corporation became the successful bidder at the sale of depot 16 on or about May 25, 1947. The price was $650,000.

Shortly after acquiring depot 16, Campbell bought out Araneta, and in late 1948 he bought out other minority stockholders, so that by the end of 1948 Campbell owned substantially all of the stock of the two Philippine corporations. Murphy was not, at any time during 1947, a stockholder in either of the two Philippine corporations. Campbell testified that in late 1950 he "gave" Murphy one half of the stock which he, Campbell, owned in the Philippine corporations.

About May 20, 1947, one Harberg, who was then moving from Los Angeles to Seattle to engage as a broker in the business of buying and selling machinery, called on the partners of "Trade Winds," a Los Angeles firm engaged in the exporting of machinery. Trade Winds advised Harberg that they had buyers for machinery and tractors and would be interested if he should be able to locate any tractors for sale in Seattle.

Harberg called on respondent shortly after he arrived in Seattle and learned from respondent that appellant might

soon have a large quantity of tractors for sale. Respondent had in mind the pending purchase of depot 16, of which he was aware. Respondent testified that on or about May 27, 1947, Murphy advised him "that we had acquired this large depot and that there was going to be a lot of money to be made by every one concerned, and that I was to find buyers and make sales for the equipment in that depot, just as fast as I possibly could, because they needed more money, and they needed it fast." Nothing was said about respondent's commission at this time other than that Murphy assured him that he would be protected on sales of the depot 16 machinery, and he assumed that he would receive his usual five per cent on sales for which he was responsible.

As a result of his conversation with Murphy, respondent advised Harberg that the tractors were now definitely available. Harberg, without revealing the seller's name, advised Trade Winds that he knew of a large number of tractors for sale. Trade Winds passed this information on to another dealer in machinery and exporter, Muller-Chester Company, which had offices with Trade Winds. Muller-Chester learned, on or about June 8, 1947, of one Glogowski in New York, who was seeking to buy tractors, and Roudin, his attorney-in-fact, who was in Manila with letters of credit totaling $11,000,000.

Roudin had arrived in Manila about April 1, 1947, as Glogowski's representative for the purpose of purchasing 1,195 tractors for the Argentine government, which furnished the letters of credit. He had contracted to buy a large number of tractors from another Philippine corporation, which, however, had indicated inability to perform its contract. He was also in the market to buy an additional large number of tractors. Roudin was in Manila at all times material to this controversy, except for the last two weeks in May, when he was in Honolulu.

On June 10th or 11th, Harberg and Trade Winds exchanged names of buyer and seller. On June 11, 1947, Muller-Chester sent a cable to Roudin in Manila, requesting that he contact Campbell regarding his purchase of tractors.

Harberg relayed to respondent the name of the buyer, and on June 11th respondent sent the following cable to the Philippine corporation:

"HARBERG IN SEATTLE HAS QUOTED VICTOR ROUDIN 75% CURRENT LIST ON OUR EQUIPMENT. STOP. WE HAVE QUOTED HARBERG AT 65% LIST STOP. ROUDIN IS NOW AT MANILA HOTEL WITH 11 MILLION DOLLAR LETTER OF CREDIT AND IS BEING NOTIFIED TO CONTACT YOU. STOP. WE ARE TO PROTECT HARBERG FOR THE 10%.

"SEVENER
"NORWESTRAC"

Respondent testified that he had discussed with Murphy his dealings with Harberg, and, in response to a question as to whether Murphy knew about the foregoing cable prior to the time it was sent, he testified:

"I believe he did, sir. He had approved that arrangement. Whether he knew that I sent that specific wire at that specific time, I disremember now, because we had made prior— had a prior agreement that those were the terms. And when Harberg told me what the name of the customer was, then it was my duty to transmit that information as quickly as possible to the office in Manila."

Murphy recalled respondent's having talked to him about Harberg and that he told respondent to quote Harberg sixty-five per cent of the list price, but he denied having seen or authorized the cable of June 11th.

Campbell testified that he ignored respondent's cable, but on June 20, 1947, appellant received the following cable from Campbell in Manila:

"1947 Jun 20 PM 12 00
"CONTRACT SIGNED WITH ROUDIN FOR $500,000 TO DELIVER 90 TRACTORS RECONDITIONED STOP 98 TRACTORS STILL AVAILABLE FOR SALES IN AC AND IHC MODELS STOP BIDDING 1484 TODAY WILL CABLE RESULTS STOP KEEP PLUGGING FOR ADDITIONAL SALES AND FINANCES STOP SITUATION BECOMING MORE FAVORABLE DAY BY DAY.

"BARNEY"

Respondent testified that, on that date,

"I told Mr. Murphy that it looked like we had made a deal, and asked him whether I was going to be protected on the deal, and he assured me that I was,"

and on cross-examination:

"And he [Murphy] said: 'If you have anything to do with this deal, you are certainly protected.' "

Murphy testified that he told respondent about June 15th that Campbell and Roudin had been negotiating prior to June 11th, and that when the cable of June 20th was received from Campbell he told respondent he would not be entitled to a commission because of their already having met and negotiated.

Respondent, in connection with another sale he made of depot 16 tractors, sent the following cable to the Philippine corporation on July 2nd:

"SEATTLE WASH
"NLT NORWESTRAC MANILA
"RECABLE W A BOYD IS CHICAGO AGENT HANDLING STANDARD OIL DEAL QUOTING THEM 75 PERCENT STOP TALKED TO BOYD TODAY AND HE WILL CALL US TOMORROW WITH DEFINITE WORD WHETHER DEAL IS CLOSED OR NOT STOP SEVENER HANDLING DEALS IN OUR OFFICE QUOTING 65 PERCENT IS PROTECTED FOR FIVE PERCENT NETTING SEATTLE OFFICE 60 PERCENT STOP EXPECT FIRM ORDER FROM ROGERS INTERNATIONAL CORPORATION NEW YORK ON THREE EACH TD NINE WITH HYDRAULIC BLADES AT 75 PERCENT TOMORROW STOP WILL KEEP YOU INFORMED.
"NORWESTRAC"

This cable was sent pursuant to an agreement with Murphy that respondent should receive a commission of five per cent of sixty-five per cent of list price only in the event that he made sales at sixty-five per cent of list or better. Respondent made three other sales from depot 16 equipment, on which he was paid such commission. Two of these sales were made through what was referred to in the testimony as a "daisy chain" of other brokers similar to the chain in the Roudin sale, each of whom was "protected" by appellant for a commission.

Respondent submitted to Murphy each month his written claim for commissions on sales for which he was responsible. He made no claim for commission on the Roudin sale during June, July or August, 1947. Respondent explained that he did not ordinarily claim his commission on sales

until they were completed and payment received therefor; that he knew a deal as large as the one with Roudin would take at least four months to complete.

Campbell returned to Seattle in late August, 1947, and respondent, on September 4th, mentioned his commission on the Roudin deal. Campbell then told him that he had known Roudin for months before the sale was made, that respondent had had nothing to do with the deal, and that he might as well forget about a commission on that deal.

Respondent therefore submitted no written claim for the commission, but on September 29, 1947, while in New York on appellant's business, he inquired at Roudin's office as to when Roudin had first contacted Campbell with reference to his purchase of the eighty-six tractors. The inquiry was relayed by someone in the office to Roudin, who was still in Manila. Roudin wrote to respondent as follows:

"KURT GLOGOWSKI
"52 Broadway
"New York, New York
 "Manila Hotel
 "Manila, P. I.
 "October 21st, 1947

"Mr. Bernard Sevener,
 Northwest Tractor & Equipment Co.
 5800 East Marginal Way
 Seattle, Washington.
"Dear Sir:—

"My New York office wrote me that you had been in to inquire about the origin of our dealings with your company here in Manila.

"Mr. Campbell never approached me or communicated with me before I walked into the company's office and introduced myself as a prospective purchaser. As I recall it, that was toward the end of May, but in any event I do believe the date is of no consequence because Mr. Campbell never contacted me—I went to him.

"I trust this is the information you desired.

 "Very truly yours,
 [Sgd] Victor Roudin
 VICTOR ROUDIN"

The fact that respondent was investigating the Roudin sale came to the attention of Campbell and Murphy. In

May or June, 1948, appellant notified respondent that his employment upon a commission basis would be terminated. He was offered, instead, a salary of five hundred dollars per month together with a share of the profits of appellant. Respondent declined this offer and resigned his employment effective July 1, 1948.

Subsequently, respondent talked with Trade Winds and Muller-Chester in Los Angeles, and his attorneys talked with Roudin, with the result that respondent began this action to recover a° commission of five per cent on the Roudin sale.

Roudin testified, by deposition, that he first met Campbell on June 14, 1947, that he did not know Campbell prior to that time, and that he approached Campbell as a result of receiving the cable of June 11, 1947, from Muller-Chester. He also testified that he had falsified, at Campbell's request, the date of his first meeting with Campbell as stated in his letter of October 21, 1947, to respondent, heretofore set out.

On his cross-examination, Roudin admitted that the sale of depot 16 had been given considerable publicity in the Philippines; that he was interested in buying tractors; that he had inspected depot 16, and that he knew that the Philippine corporation was the successful bidder for it.

Campbell testified that he knew of Roudin prior to the time that the Philippine corporation acquired depot 16, that he began negotiations with Roudin prior to receiving respondent's cable of June 11th, and that his associates in Manila had also known Roudin and discussed with him or his agent a sale of tractors prior to June 11, 1947. Campbell denied that he had at any time asked Roudin to falsify as to the date when they first met.

Appellant also introduced certain documentary evidence in attempting to establish that negotiations with Roudin had been instituted prior to June 11, 1947.

The final contract of sale with Roudin was made June 25, 1947. Northwest Commercial Corp. was designated as the seller because the tractors involved in the sale to Roudin had previously, on or about June 12, 1947, been transferred or

sold to it by the Philippine corporation. The contract recited that "the prices as quoted and listed above represent and are on the basis of sixty-five (65%) per cent, present date, F. O. B. factory prices."

Appellant introduced evidence also to establish that no commission had been paid to it by the Philippine corporation on the Roudin sale.

While seemingly Campbell and Murphy had, in 1947, based their refusal to pay respondent a commission on the Roudin transaction on the ground that negotiations with Roudin had begun before June 11, 1947, at the trial of this action they also maintained that respondent would not be entitled to a commission in any event, where he merely found a buyer and did nothing further to consummate the sale. Appellant also contended that respondent acted without authority in dealing through the other brokers; that he had no authority to employ or obligate appellant to pay subagents in making sales; that appellant made no profit on the sale and could not, therefore, be held liable to respondent for a commission; that Murphy had no authority to and could not bind the corporation to pay a commission on the sale of property not owned by appellant and from which it derived no profit; and that respondent's part in the Roudin transaction was of no value to appellant for the reason that, assuming Roudin and Campbell had not met and negotiated before the cable of June 11th was received by Campbell in Manila, still the evidence established that they would inevitably have met and negotiated the sale without any assistance from him.

The trial court instructed the jury upon all these theories advanced by appellant.

Before considering appellant's various assignments of error, we shall first note the position taken by appellant in its brief that respondent, by failing to reply to the affirmative defenses contained in the answer, admitted them, as provided by RCW 4.36.160.

The action was tried upon the assumption that a general denial had been made by respondent to the affirmative defenses. Appellant introduced evidence in support of the

allegations therein contained and cross-examined respondent at length as to whether he was authorized to deal through other brokers with a promise of "protection" to them. The court, in its instruction No. 1, outlined the issues presented by the pleadings and stated, "Plaintiff denies the affirmative allegations made by defendant in its answer."

No exception was taken to this instruction and it thereby became the law of the case. Appellant cannot now urge that its affirmative defenses were admitted by respondent's failure to file a reply.

We shall first consider appellant's fourth assignment of error, which is directed to the admission in evidence of a memorandum used by Roudin to refresh his memory at the time his deposition was taken. This memorandum consisted of a small pocket notebook which Roudin had carried with him while in Manila. He described it in his testimony as

". . . a little paper note-book which really constituted a diary; in other words, I would make notations of things I had to do and all appointments, but I never put down the terms of any agreement in that book. . . . I should say most of it is in my own handwriting."

Having refreshed his memory from it, Roudin testified positively that his first meeting with Campbell occurred on June 14, 1947. The notebook was identified and marked as an exhibit at the time Roudin's deposition was taken, but was not then offered. Respondent offered it in evidence at the close of his case, and the court admitted it over appellant's objection that no foundation had been laid therefor and that it was immaterial, irrelevant, and incompetent.

The notebook contained a number of names and notations of various personal appointments, all arranged by dates between April 9 and July 3, 1947. Campbell's name appeared therein for the first time under date of June 14th. If that were all, admission of the notebook might very well constitute prejudicial error, for

"A diary or other writing is not made evidence by its use to refresh the memory of a witness or by the fact that it would be permissible to use it for such purpose. If the witness after examining the writing testifies from his own inde-

pendent recollection of the facts, the writing may not be introduced as evidence or read or submitted to the jury." *State v. Coffey*, 8 Wn. (2d) 504, 112 P. (2d) 989.

However, the notebook was used by appellant after its admission in evidence in attempting to prove its own version of the facts. In its examination of Campbell, appellant first established that Araneta was a joint adventurer in the purchase of depot 16 and had an interest in effecting sales of machinery therefrom. Campbell testified that Araneta's name appeared in the notebook under dates of June 4th and June 10th. This was for the purpose of showing that Roudin had appointments with appellant's co-adventurer on those dates. While we do not find Araneta's name in the notebook under any date prior to June 10th, the fact that it appeared on that date tended to confirm appellant's contention that Roudin had dealt with agents of the Philippine corporation prior to the receipt by Campbell and Roudin of the cables of June 11th.

█ While a party does not waive his objection to the admission of incompetent evidence by subsequently introducing evidence in self-defense to explain or rebut the incompetent evidence, he may by subsequently using it for his own purposes, or by introducing evidence similar to that already objected to, waive his objection. *State v. Pattison*, 135 Wash. 392, 237 Pac. 1000, 241 Pac. 966; *Dell-Wood Tires v. Riss & Co.*, 198 S. W. (2d) (Mo. App.) 347; *Scott v. Gidelight Mfg. Co.*, 37 Ga. App. 240, 139 S. E. 686. See I Wigmore, Evidence (3d ed.) 344, § 18 (D).

Appellant, by using the notebook to support Campbell's testimony that Roudin had negotiated with the Philippine corporation regarding the tractors prior to June 11th, used the notebook for its own benefit and thereby waived its objection. Appellant cannot now, therefore, urge this assignment.

Appellant next assigns error to four instructions given by the court, the first being instruction No. 7, in which the court instructed that if the jury found for appellant on the first cause of action, it should return a verdict for respondent

on the second cause of action for the reasonable value of his services, if any, in finding a buyer if it found from a fair preponderance of the evidence that respondent, on or about June 11, 1947, at the special instance and request of appellant, found a buyer for the eighty-six tractors.

■ Appellant argues that it was part of respondent's duties, for which he was paid a salary of two hundred dollars per·month (deductible from any commissions earned), to transmit to the Philippine corporation any information he might acquire concerning a prospective buyer in the Philippines, and that there was no evidence of the reasonable value of the acts performed by respondent in connection with the Roudin transaction which would sustain a verdict based upon the *quantum meruit* cause of action.

We cannot agree with appellant's theory. Respondent testified that on several occasions he was compensated at the rate of five per cent of the sales price when he merely found the buyer; that, if his first contact with the buyer resulted in the sale, he was paid a commission of five per cent regardless of whether he or someone else later consummated the sale; and, conversely, that he performed administrative duties and had "paper work" to do in connection with sales effected by Murphy or Campbell, upon which he received no commission and expected none. We believe that the evidence of respondent's compensation in other transactions where he merely found the buyer was competent to establish the reasonable value of his services to appellant in the Roudin transaction. It was not error for the court to instruct upon the *quantum meruit* cause of action.

■ Appellant next complains of instruction No. 8:

"If you find from a fair preponderance of the evidence that plaintiff was entitled to be compensated for finding a buyer for the tractors here in question, then he would be entitled to such compensation if he did find such buyer, whether he found the buyer directly or through the advice and assistance of others."

It is appellant's position that the instruction is erroneous for the reason that respondent had no authority to employ

other brokers on behalf of appellant. But this was an issue of fact for the jury to determine. Nor does the instruction conflict with the preceding instruction, No. 7½, which was favorable to appellant. By that instruction, the jury was told that, if it found that respondent had acted in an unauthorized manner and was not authorized to obligate appellant by employing other brokers, then they must find that respondent was not entitled to compensation.

Reading the instructions as a whole and construing Nos. 7½ and 8 together, we find no merit in this assignment of error.

Appellant next complains of instruction No. 11:

"A joint adventure is an enterprise jointly undertaken in which the profits as well as the losses are to be shared under an express or implied agreement. Corporations may affiliate and join together in a joint enterprise and as such joint adventurers they each are liable to third parties for the payment of the expenses and debts incurred in such enterprise or joint adventure."

Appellant concedes that the instruction correctly states the law of joint venture, but contends that it was prejudicial error for the court to give this instruction for the reason that there was no evidence that appellant and the Philippine corporation at any time shared profits or losses or agreed to do so, and no showing that they shared any profits or losses connected with the Roudin transaction.

The relationship of joint venturers may be inferred from the facts of a case, and the contract may be express or implied. *Edwards v. Washkuhn,* 11 Wn. (2d) 425, 119 P. (2d) 905. The evidence material to this assignment showed that Campbell and Murphy first considered having appellant buy depot 16; that another corporation was formed to make the purchase for their own reasons, principally to save taxes; that Campbell was president of both corporations; that he later equally divided his Philippine holdings with Murphy; that appellant had, through its loan to Campbell, invested $200,000 in the Philippine corporation, and that appellant was expected to and did participate in the venture by selling machinery acquired through the purchase of depot 16.

This evidence was sufficient to warrant submission to the jury of the factual issue whether a contract of joint venture actually existed between the two corporations, and it was therefore not error to instruct upon the law of joint venture.

■■ Instruction No. 12½, next complained of, reads as follows:

"If you believe that the defendant and the plaintiff entered into an agreement under which the plaintiff was entitled to a commission merely for finding a prospective purchaser, then your verdict shall be for the plaintiff if you also believe that the plaintiff was the one who caused the purchaser to seek out the seller. On the other hand, if you believe that the purchaser and the seller, or their agents, met and initiated negotiations before the performance of any act by the plaintiff, *or if you believe that under the circumstances existing the purchaser and the seller, or their agents, would inevitably have met and closed their deal without any assistance from the plaintiff, then your verdict should be for the defendant.*

"Even though you believe that Campbell and Roudin would have met in Manila without plaintiff's activities, if you further find that the cables sent by Muller and Chester and plaintiff actually did bring them together as buyer and seller, it is immaterial that they might eventually have met anyway and consummated a sale." (Italics ours.)

Appellant concedes that the italicized portion of the instruction is a correct statement of the law. See *Lord v. United States Transp. Co.*, 143 App. Div. 437, 128 N. Y. S. 451, and *Pitts v. Pitts*, 63 Okla. 185, 164 Pac. 105.

Its complaint is directed to the second paragraph, which, it contends, is directly contradictory of the italicized portion, is an improper statement of the law, and could serve only to confuse the jury. We believe that the meaning of the last paragraph is not in contradiction of the italicized portion, and that the entire instruction presented a theory which it was to appellant's advantage to have the jury consider. The second paragraph states, in effect, that should the jury believe that Campbell and Roudin would merely have met (but not necessarily have closed their deal) regardless of respondent's activities, if the jury should further find that respondent's activities actually brought the two

principals together *as buyer and seller*, then it was immaterial that they *might* eventually have met and consummated a sale.

An agent should not be precluded from recovering a commission on a sale if he was the efficient cause of the buyer and seller getting together and making the sale merely because, under the circumstances existing, the buyer and seller *might* eventually in the course of subsequent events have met and negotiated a sale without his assistance.

The instruction is therefore free from error.

Appellant requested three instructions emphasizing that the mere introduction of the prospective buyer to the seller does not entitle the agent to a commission unless it is further shown that the agent was the efficient and procuring cause of the sale which was ultimately made, and that, if some other person actually induced the buyer to buy and was the efficient and procuring cause of the sale which was ultimately made, respondent would not be entitled to recover. It assigns error to the refusal of the trial court to give these requested instructions.

The court did instruct as follows:

"If you believe that there was an agreement between the defendant and the plaintiff, and that such agreement contemplated the payment to the plaintiff of commissions for sales which were made by the plaintiff or for sales for which the plaintiff was directly responsible, then I instruct you that the plaintiff is entitled to the payment of a commission on the transaction involved in this case, if you find, by a preponderance of the evidence, that the plaintiff was the efficient and procuring cause of the sale. By the term 'efficient and procuring cause,' I mean the cause without which the sale would not have taken place."

Error may not be predicated upon the court's refusal to give a requested instruction if its subject is sufficiently covered by another instruction. *Brown v. Intercoastal Fisheries,* 34 Wn. (2d) 48, 207 P. (2d) 1205; *Lynch v. Republic Pub. Co.,* 40 Wn. (2d) 379, 243 P. (2d) 636.

The quoted instruction given (No. 12¾) was adequate upon the subject discussed therein, and the court's refusal to give the requested instructions was not error.

 Appellant assigns error to the trial court's denial of its motion to dismiss the action made at the close of respondent's case. Appellant did not stand upon its motion to dismiss, but went forward to produce evidence in its own behalf. It thereby waived its motion, and we cannot now consider this assignment of error. *Hansen v. Lindell,* 14 Wn. (2d) 643, 129 P. (2d) 234; *Hanford v. Goehry,* 24 Wn. (2d) 859, 167 P. (2d) 678.

Appellant also assigns as error the court's denial of its motion for a directed verdict made at the close of the trial with respect to each of respondent's two causes of action and the denial of its motion for judgment notwithstanding the verdict.

In *Evans v. Yakima Valley Transp. Co.,* 39 Wn. (2d) 841, 239 P. (2d) 336, we quoted with approval the following from *White v. Burke,* 31 Wn. (2d) 573, 197 P. (2d) 1008:

"The rule which we have applied, and which should govern both the trial court and this court, is stated in *White v. Burke,* 31 Wn. (2d) 573, 197 P. (2d) 1008 (quoting from *Simmons v. Cowlitz County,* 12 Wn. (2d) 84, 120 P. (2d) 479), as follows:

" ' "We have uniformly held that a motion for judgment notwithstanding the verdict should not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from the evidence to justify the verdict." '

"The court continued by defining the type of evidence to be considered by us as:

" ' "All *competent* evidence in the record which is favorable to the appellants we must regard as true and must give to them the benefit of every favorable inference which may reasonably be drawn from such evidence. Where the minds of reasonable men may differ, the question should be submitted to the jury. If, when so considered, we find there is substantial evidence to sustain the verdict, the judgment thereon must be affirmed." ' (Italics ours.)"

 We are of the opinion that the minds of reasonable men could have differed upon the evidence presented in this

case, and that there was sufficient conflicting evidence upon all the material issues to make their determination a matter for the jury. Much of what we have heretofore said in discussing the instructions complained of relative to the *quantum meruit* cause of action and the theory of joint venture, answers appellant's present arguments.

Appellant urges, however, with reference to the first cause of action, that there was no evidence of any agreement between respondent and it whereby he would be paid a commission on the Roudin transaction; that the only agreement was reached at a later date to the effect that respondent would be compensated at the rate of five per cent of sixty-five per cent of the factory list price on sales from depot 16. There was, however, sufficient evidence from which the jury could reasonably have concluded that there was an implied contract prior to the Roudin transaction that respondent would be paid his regular commission of five per cent on sales from depot 16.

Again, with reference to the issue of fact as to whether respondent became entitled to and was paid commissions with respect to other sales where he merely found the buyers, without performing other duties in connection with the consummation of the sales, there was substantial evidence that respondent was so compensated.

We therefore conclude that the evidence upon all the issues was sufficient to take the case to the jury, and that the court did not err in denying the motions for a directed verdict and for judgment notwithstanding the verdict. The scope of our review here is limited to the question whether there was substantial evidence to sustain the verdict; we cannot weigh the evidence, nor will a judgment be reversed even if the verdict is against the weight of the evidence where there is no reversible error in the conduct of the trial. *Jones v. Elliott,* 111 Wash. 138, 189 Pac. 1007; *Skeels v. Davidson,* 18 Wn. (2d) 358, 139 P. (2d) 301, 149 A.L.R. 225. In this case, the jury upon sharply conflicting testimony chose to believe that produced by respondent.

Appellant's remaining assignment of error is directed to the trial court's denial of its motion for a new trial. In the

order denying the motion, the trial court failed to give definite reasons of law and fact for so doing as required by Rule of the Superior Courts 16, 34A Wn. (2d) 117.

Appellant has made no argument in support of its last assignment of error other than its argument concerning the admission of Roudin's notebook, and it is not necessary to discuss the denial of the motion for a new trial.

Since we find no error in the record, the judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, GRADY, and WEAVER, JJ., concur.

