[No. 32494. Department Two. December 28, 1953.]

WEBSTER MINCH, *Respondent,* v. LOCAL UNION No. 370, INTERNATIONAL UNION OF OPERATING ENGINEERS, *et al., Appellants.*[1]

[1]Reported in 265 P. (2d) 286.

16

*Witherspoon, Witherspoon & Kelley,* for appellants.

*Moulton, Powell, Gess & Loney* and *Tonkoff, Holst & Hopp,* for respondent.

FINLEY, J.—In this action for damages, the plaintiff alleged that a conspiracy against him by certain union officials prevented him from obtaining employment, and resulted in a substantial loss of wages. A jury decided the case in plaintiff's favor and awarded damages in the sum of ten thousand dollars.

Reduced to essentials, the significant questions raised here on appeal by defendants (the union and its officials) are: (1) whether plaintiff's evidence was sufficient to support the jury's view that the defendants conspired to prevent the plaintiff from obtaining employment; and (2) whether the trial court erred (a) in rejecting the defendants' offer of proof that plaintiff had a criminal record, and (b) in excluding evidence that he was incompetent as a power-shovel operator. In connection with the latter, it should be mentioned that it was defendants' theory that the matter of plaintiff's criminal record and incompetence, if available for consideration by the jury, could have provided a basis for a conclusion that plaintiff's employment possibilities thereby, in any event, would have been seriously limited and he would have made less than claimed by him, irrespective of any prejudicial action against him by the union and its officials.

In the following somewhat detailed opinion, we decide the first question in favor of the plaintiff, the second question in favor of the defendants, and a new trial is granted solely on the question of damages.

The theory on which plaintiff Minch proceeded in the trial court was that the Local Union No. 370 of the Inter-

national Union of Operating Engineers, through its business manager, Art Rossman, and its president, Doc Burget, conspired to and did expel him from the union. It was contended that, after his wrongful expulsion from the union, the defendant officers conspired further to prevent Minch from procuring gainful employment in his calling as a power-shovel operator within the territorial jurisdiction of the union by violating provisions of the union constitution in failing to reinstate him to membership, pending the outcome of his appeal of his expulsion. Minch claimed that the motivation behind the alleged conspiracy was Rossman's and Burget's personal animosity against him because of his active role in trying to effect an amalgamation of Local Union No. 370 with the Seattle local of the same international union, and because of his candidacy for Rossman's office in Local Union No. 370.

On the other hand, the theory of the defendants was that the union trial against Minch was fair; that he was charged and tried for just cause, *i.e.*, because of his actions defaming union officials, and causing dissension within the union membership; and finally, that Minch was not *expelled,* but, actually, was only *suspended.* It is contended that the evidence fails to show any conspiracy; that the general lack of employment in the Spokane and Pasco areas at the relevant time, coupled with Minch's criminal record and his incompetence as a workman, prevented him from obtaining employment in the Hanford area; hence, any damages resulting from the union's action against Minch would be minimal or nonexistent.

The evidence is sharply conflicting in most of its material respects. It shows that Minch came to this state early in 1948, and transferred his membership from an Ohio local to Local No. 370, in June of 1948. There is evidence in the record that, prior to plaintiff's joining Local No. 370, sentiment existed among some members of that local in favor of amalgamation with the Seattle local. Soon after Minch joined the union, he became active in favor of the amalgamation movement. As we have already said, Minch con-

tends that ·Rossman and Burget were opposed to the amalgamation because they feared· that it constituted a direct threat to their continuance in office as officials of Local No. 370, and that, by advocating the amalgamation, he incurred their enmity. In any event, the amalgamation movement was abortive, the membership of Local No. 370 having voted it down in the summer of 1949.

During the summer of 1949, Minch went to Alaska, temporarily, and remained there until early in 1950. While the evidence is not crystal clear on this point, apparently as soon as he returned from Alaska, he resumed his efforts to take a role of leadership in the union. After his return, Minch was one of a group of members of Local No. 370 who authored an allegedly libelous pamphlet entitled, "So That You May Know." This pamphlet charged derelictions in office by the existing officials. It suggested a mishandling of union funds and charged the then officers with ruling with an autocratic hand. The union claims that Minch wrote the pamphlet. The evidence is conflicting on this point. An examination of the document shows why its authorship is attributed to a "John Doe."

Early in 1950, Doc Burget filed charges against Minch for alleged violation of certain provisions of the union constitution. These charges were advanced in a letter to Mr. Rossman, and Minch was furnished a copy of the letter. In a reply, written after receipt of the charges, Minch denied guilt and indicated he would welcome ·the opportunity to defend himself as to the charges. The letters are as follows:

"Arthur A. Rossman, Recording-Corresponding Secretary
Operating Engineers Local 370
325 S. Browne
Spokane, Washington
"Dear Sir and Brother:
    "This is to advise you that as President of Local 370 I am preferring charges against Webster D. Minch, Register No. 158018, for violation of the constitution of the International Union of Operating Engineers, specifically Article XVI, Section 1 and Article XXIII, Subdivision. 7, Section (e). Will you please advise Brother Minch that the charges

have been filed and set a date for him to file his plea in accordance with the general constitution.

> "Fraternally yours,
> "/s/ Doc H. Burget
> "President, Operating
>     Engineers Local 370"

"February 2, 1950
"Mr. Webster D. Minch
"W. 217 Clark Street
"Pasco, Washington
"Dear Sir and Brother:

"I am enclosing a true copy of charges preferred against you by President Doc Burget of Local 370. In accordance with Article XXIII, Subdivision 7, Sections (m) and (n) I am requesting that you file with me in writing your plea of guilty or not guilty together with any statement you wish to make on or before Friday, February 24, 1950.

> "Fraternally yours,
> "/s/ Arthur A. Rossman
> "Recording-Corresponding
>     Secretary
> "Local No. 370"

"Secretary
"Local 370
"Spokane, Washington
"Dear Sir and Brother:

"In regards to your letter of February 2, 1950, concerning charges against me by Local 370, I plead not guilty and welcome any action taken against me.

> "/s/ Webster Minch
> "      217 W. Clark St.
> "      Pasco, Washington"

The union constitutional provision which was allegedly violated by Minch (as stated in the charges) is Article XXIII, Subdivision 7, § (e), reading substantially as follows:

"Any officer or member of a Local Union who becomes an habitual drunkard; who wrongs a fellow member or defrauds him; who commits an offense discreditable to the International Union or its subdivisions; who creates dissension among the members; who destroys the interest and harmony of the Local Union; who seeks to dissolve any Local Union or separate it from the general organization; who wilfully slanders or libels an officer or member of the Organization; . . . may be disciplined or, upon trial

therefor and conviction thereof, be fined, suspended or ex-pelled from his Local Union."

Minch's trial occurred at a regular meeting of the union held on March 3, 1950. At the trial, he was represented by a fellow-member. Although the parties' briefs treat various aspects of the union trial at great length, we shall not do so other than to note that, of the members present, appar-ently sixty of them voted to convict Minch, thirty voted to acquit him, and the rest refrained from voting (for some unexplained reason). However, because of the importance it has on the issues, we set out in full the pronouncement of sentence made by Doc Burget:

"Brother Minch, it is my duty as Chairman of this or-ganization to tell you that I am going to have to reprimand you for the things that you have been found guilty of by a vote of 60 showing you Guilty and 30 Not Guilty; therefore, Brother Minch, I can't help but feel that it is my duty to place a $250 fine on you and expel you from the rights and privileges of the territorial jurisdiction of Local 370. I might say that if you are not satisfied with that you have a right to appeal to the General Executive Board. That will be your privilege, Brother Minch."

In this same connection, with regard to the quorum neces-sary for expulsion, we set forth, in part, Article XXIII, Sub-division 7, § (o), of the Union Constitution:

" . . . A three-fourths vote of the membership re-corded as present shall be required for conviction in cases involving expulsion and a majority vote in cases involving other penalties . . ."

In the trial court, in support of his theory that the officials were out to get him, plaintiff produced witnesses who testi-fied that Rossman had said on a number of occasions that Minch was a troublemaker and that he would have to be eliminated from the union. These statements were denied by the officials who were charged with making them. Ob-viously, the purpose of this testimony was to show a back-ground of conspiracy motivating the union trial against Minch.

Following the union trial and after paying his $250 fine,

Minch appealed to the general executive board of the union. It appears from the record that Minch procured a number of delays in the appeal in order fully to prepare his case. Also, he continued to pay dues after the union trial. Minch emphasizes the union constitutional provisions to the effect that the results of any union trial may be stayed pending an appeal, so long as an allegedly offending member pays his dues and any fine assessed against him. He contends that Rossman and Burget ignored this union provision, and, furthermore, that they conspired to prevent him from obtaining employment in the area thereafter by treating his expulsion as immediately effective. The evidence on this aspect of the conspiracy is in sharp conflict, as is most of the evidence. Plaintiff's witnesses testified to the effect that it was defendant officers' purpose to starve Minch out financially by preventing him from getting employment. There is also evidence in the record which, if believed, tends to show that Minch's name was kept on the bottom of the work-availability list and that he was not referred to available jobs. However, as we have just said, the evidence is sharply conflicting on this point.

With the evidentiary facts as recounted above in mind, we turn to the assignments of error. The first three relate in one form or another to the legal sufficiency of the evidence (a) to make out a cause of action, and (b) to raise questions for the jury's consideration. The substance of the arguments in support of these assignments is that there was a total failure of proof of any conspiracy on the part of the defendant officers, and that the evidence shows that only disciplinary action was taken against Minch for rightful cause.

At the end of the plaintiff's case, defendants moved for nonsuit and to dismiss the plaintiff's action. The motions were denied. Thereupon, defendants proceeded with their case in chief. They have waived the right to assign error to the denial of the motions. *Sevener v. Northwest Tractor & Equipment Corp.*, 41 Wn. (2d) 1, 247 P. (2d) 237.

At the close of the entire case, the defendants again challenged the sufficiency of the evidence to show a civil conspiracy and moved for a directed verdict on the grounds of total failure of proof. Error is assigned to the denial of this motion for a directed verdict. Whether the court erred in denying this motion depends, of course, on the state of the evidence and whether, considering the rule to be applied when the legal sufficiency of the evidence is challenged, it was so clearly in defendants' favor that the court should have withheld the pertinent issues from the jury.

■ Before turning to any consideration of the evidence, we set out a statement of the rule applicable to motions challenging the legal sufficiency of the evidence, as found in *Olsen v. White,* 37 Wn. (2d) 62, 221 P. (2d) 542:

"A challenge to the sufficiency of the evidence, a motion for nonsuit, *a motion for a directed verdict,* or a motion for judgment notwithstanding the verdict admits the truth of the evidence of the party against whom the motion is made and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. [citing cases.] When confronted with such a situation it becomes the duty of the court to be guided by the above rule, rather than to consider all of the evidence presented during the trial." (Italics ours.)

■ The evidence was conflicting as to pertinent factual questions. With this in mind, merely to quote the above-indicated rule is sufficient to show that the trial court did not err in denying the motion for a directed verdict, and that the pertinent factual questions were properly submitted to the jury. We might go further and say that it is for the resolution of such factual issues that juries are intended and ideally suited. Given the theory of the plaintiff's action—a civil conspiracy—the conflicting evidence and the fact that often such a charge must be proved by circumstantial rather than by direct evidence, as we have already said, it was for the jury to decide whether a conspiracy existed. Similarly, it was not error for the court to deny defendants' motion for judgment notwithstanding

24

the verdict. Nor can it be said that the court abused its discretion in denying defendants' motion for a new trial.

What we have just said disposes of the initial three assignments of error. However, we think it is desirable to comment upon various arguments by appellants concerning the union trial and the claim that Minch was *suspended* for cause pursuant thereto. Appellants claim that the trial was fair, after due notice for just cause; that, by contract, each member of a union assents to being suspended or expelled for activities detrimental to the purposes of the organization; that the union trial was a matter of internal discipline, not a *de novo* matter in the trial court, or here, and hence one into which the trial court should not have interjected itself; that Minch abandoned his union appeal, has not exhausted his union remedies (as he should be required to do before he can sue for damages); and that, while the sentence pronounced by Burget used the word "expel," actually, the conduct of both sides of the union controversy shows that each considered the union's action as to Minch as a *suspension* rather than an *expulsion*.

To discuss at length the various principles of labor union law cited by the appellants, would protract this opinion unduly. Any lengthy discussion can be obviated by reference to several basic propositions of labor union law.

■ Undoubtedly, a union member just as a member of any other voluntary association consents to be bound by union rules and to be disciplined for infractions thereof. Dangel and Shriber, Labor Unions, 195, § 171. But the mode of discipline as prescribed by the union's organic law must be followed. Dangel and Shriber, *supra,* 199, § 175. Disciplinary proceedings must be *prosecuted in good faith* before they can be said to be conclusive on the courts in subsequent actions. Dangel and Shriber, *supra,* 203, § 178. Furthermore, while a member of a union must exhaust his union appellate remedies before the courts will interject themselves into controversies between him and his union (*Constantino v. Moreschi,* 9 Wn. (2d) 638, 115 P. (2d) 955), it is nevertheless a question of fact for the jury as to

whether those remedies have been exhausted. Dangel and Shriber, *supra*, 215, § 187.

Considering these rules, again it cannot be said that the court erred in submitting to the jury the issues raised by the evidence. When considered in isolation and removed from the background evidence, it might be said that the union proceedings were prosecuted in good faith, and, consequently, should be conclusive upon courts in subsequent proceedings; however, there is more to the matter than is indicated by such a narrow approach. It must be remembered that the background evidence, among other things, relating to animosity between Minch and the defendant officers, is susceptible of an interpretation that a conspiracy did exist and that it resulted in Minch's expulsion from the union. In this same connection, giving due weight to the evidence of defects in the union trial and the fact that Minch was expelled on less than the number of votes necessary for expulsion under the union constitutional provisions and giving due weight to the evidence that after payment of his fine and current dues Minch was not fully reinstated to union membership pending the outcome of his appeal, the inference that he was railroaded and conspired against becomes even stronger. As we have said twice before, all of these factors were for the jury's consideration. It was for the jury to decide from the conflicting evidence whether or not there had been a conspiracy against Minch. See 21 A. L. R. (2d) 1387.

We are of the opinion that there is merit to several of the appellants' assignments of error which go to the issue of damages.

■ First, however, with regard to the ruling of the court permitting a blackboard demonstration before the jury to show a theoretical computation of damages or loss of earnings, we do not think it can be said that the demonstration was error. The rate of pay of a power-shovel operator was multiplied by the number of hours worked weekly, by the number of weeks in one year. This demonstrated the maximum yearly earnings possible. Obviously, it assumed maximum or full employment. The demonstration was

based on evidence in the record. Appellants similarly might have used a blackboard to demonstrate yearly earnings at a figure less than maximum, based upon evidence in the record adduced by appellants, from which it might have been inferred that employment possibilities for Minch in the area were less than maximum during the period involved. The demonstration was allowable in the discretion of the trial court.

We are of the opinion that the court erred in denying appellants the right to prove Minch's criminal record, consequently, an opportunity to argue to the jury that the criminal record would have cut down Minch's possibilities of employment and would have limited his claim to damages. It appears from the appellants' offer of proof, made to the trial court, that one of the main opportunities for work in the area was the atomic energy project at Hanford. Before one could work there, he needed security clearance by the Federal bureau of investigation, to which end a personnel security questionnaire or an employment application was used. One of the questions appearing thereon elicited information as to an applicant's prior criminal record. It appears that Minch, in answering this question, denied any prior criminal record; whereas, if he had revealed that he did have such a record, or if, without revealing it, the fact had been discovered through F. B. I. investigation, he may have been denied work in that area for government security reasons. Appellants also offered to prove that, in fact, the F. B. I. did remove Minch from the Hanford project in 1948.

In examining the record, we note that the court allowed respondent a wide latitude in bringing in evidence bearing on his damages. We also note that, while the jury was instructed that they might consider Minch's criminal record solely for the purpose of impeaching his credibility as a witness, nevertheless, by the ruling mentioned above, the jury was prevented from considering Minch's criminal record as substantive evidence bearing upon and which might ultimately have reduced damages. In saying this, we do not

imply that the rejected offer of proof necessarily would have been conclusive upon the jury, but merely that it should have been made available for consideration, and the matter left for the jury to determine the probative value or weight to be assigned.

While we have been unable to find any authority permitting the criminal record of a litigant to come in for the purpose of reducing damages, we are of the opinion that, under the circumstances of the instant case, the offer of proof should have been acted upon favorably by the trial court.

Unquestionably, the lack of authority on this point stems from the fact that the situation presented is unique. We cannot see how the problem will arise frequently in the future. However, if one of the main sources of employment in the area was in a Federal project, and if the Federal government prescribed drastic restrictions as to Federal employment in that area for security reasons, we see no reason why the jury should have been precluded from considering this factor as one indicating that respondent could not have earned as much as he claimed he could. Since respondent was accorded broad latitude in proving what wages he would have made, fairness requires that appellants should be permitted to make out their side of the case, seeking to impress upon the jury the fact that respondent's damages were less than he claimed.

In this connection, appellants similarly should have been permitted to develop their theory that Minch was not competent in his calling and that some of his former employers considered him inept.

The assignments of error not referred to hereinbefore have been considered. We think they may be disposed of without further discussion.

The cause is remanded to the trial court for a new trial on the issue of damages only.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.

March 9, 1954. Petition for rehearing denied.